The next case on our calendar is Loretta Gallagher and Gallagher Associates v. the City of New York. Good morning, you may proceed. Good morning, Your Honors. Ronald Berruti of the Wiener Law Group on behalf of the plaintiffs. May it please the court. The court below errantly denied leave to permit filing of a second amended complaint. De novo review of the second. How long was that second amended complaint? How long was it? How long was it? It was probably about 100 pages, I don't have the exact number, and it was I think about 500 paragraphs. However, under Rule 8, I respectfully submit that Rule 8 does not govern length so much as substance. Looking at Professor Moore's comments on Rule 8, given the Iqbal and Twombly standard, there is a requirement that the complaint demonstrate plausibility. This is a complaint, second amended complaint, had a logical progression of issues. It was highly detailed. It was non-conclusory. And with respect to each and every cause of action stated therein, we went back and referenced the substance of allegations and the fact portion that supported each and every of the key causes of action. Every one of the causes of action is plausible. And in fact, again, these are non-conclusory allegations. They're very detailed and very factual, very fact-specific. So looking at, given de novo review and given the Twombly and Iqbal standards, we believe this is an absolutely appropriate complaint. And frankly, I imagine that the allegations would be that it's not specifically pled enough if we didn't specify all these things. There's nothing that supports at this point that the complaint should have been, the first amended complaint should have been thrown out or that the second amended complaint should have been denied without any discovery. Here we have a situation where there are very, very specific allegations of gender discrimination during the time period during which Loretta Gallagher and Gallagher Associates was at HHC. Also, there's very specific allegations as to acts of retaliation with respect to speech issues that she had. And at the very least, we should be entitled to our day in court to be able to flesh out these allegations and to have an opportunity to demonstrate the worthiness of these causes of action, which are very, very serious. The court below only looked at one factor on futility. And we, in the very painstaking amended complaint, here we have a pioneering female business that is shut down, basically, on issues of gender discrimination. But the agreement that your client adhered to provided that either party may at any time for no reason terminate this agreement in whole or part by written notice to the other party. Yes. Was she bound by that? There's a tripartite contract agreement arrangement here. That's only one part of the tripartite arrangement. Did this provision that I just read to you apply to your client? My argument is that it applies to the extent that it's not ambiguous. But it is ambiguous because it's internally inconsistent. The contract language itself. What do you think is inconsistent about the language I just read to you? Well, what's inconsistent is that in the subsequent clause, it says there can only be termination for cause after giving written termination. It talks about written termination. And then it says written termination can be given when there's cause and a chance to cure. So there's an internally inconsistent. It's almost like there's a boilerplate clause and then there's the subsequent inconsistent clause. And then also in the tripartite arrangement. Doesn't it unambiguously provide for two ways in which one can be terminated, for any reason or for cause? If you're going to terminate for cause, you have to abide by slightly different requirements. Why would there even be a cause? Principally being that you have to give, if you're going to terminate for cause, you have to give an opportunity to cure a breach. Why would there be a provision for cause if you can terminate for any reason? It doesn't make any sense. Isn't that what it says? It does say that. But it's inconsistent within its own terms. And it's written. Contra-prophorentum analysis has to be applied here. It's written by the defendants. And they have the internal inconsistency within that clause. And on top of that, importantly, we've alleged and the court has to accept as true the allegations that there's a tripartite contract arrangement here. The defendants themselves have admitted and acknowledged that the HHC was not a stranger to this contract between Gallagher and DynTech. And if they're not a stranger, there are two different contracts. There's the HHC-DynTech contract, which incorporates policies and procedures, which provides for you cannot terminate contractors based upon gender and retaliatory reasons, among a lot of other things. Your client wasn't eligible to have a contract directly with HHC. Is that right? That's right. That's right. But as HHC has argued itself, as it has admitted, they are not a stranger to the contract. That the contract that my client had with DynTech was really one of convenience. DynTech is a large organization that can have the tie to the city so that they can pull in small subcontractors like my client, again, who is a pioneering female business. The HHC-DynTech contract very specifically incorporates policies and procedures whereby contractors cannot be terminated based upon discriminatory motives, such as gender, such as retaliation, which are very detailed and well pled here. Here we have, besides the one factor that was looked at by the court below, which was the affidavit with the vote taken, which was absolutely disgusting and appalling, there is many, many allegations specified by paragraph, chapter and verse, as to actions that were taken that supported claims of gender discrimination here. And especially under the new count that was provided in the second amended complaint, the contract itself is not really the be-all and end-all under the human rights law. If there is a whiff of gender discrimination in terms of, or discrimination in terms of the reasons for termination, there's a human rights law claim. That should have been allowed. Your client was discharged by DynTech, is that right? That's not correct. My client was discharged directly by HHC. That's the allegation. DynTech was not involved in the termination. And therefore, that's extra evidence that New York Health and Hospitals Corporation understood that there was a relationship with Gallagher. That was, if this was truly a contract only between DynTech and HHC, and DynTech and Gallagher, HHC could not terminate my client, but they did. That's the allegation that's well pled. And this Court is supposed to accept that as true on its face with respect to this part of the stage of the pleadings. Again, my client has a tripartite arrangement. Contra pro forentum analysis of the internally inconsistent clause requires that it be construed at this point in favor of my client. The human rights claim doesn't rely upon contract anyway. And there's plenty of evidence of gender and retaliatory animus here that should allow us to go forward and to file the second amended complaint and to be able to have an opportunity to flesh out these claims, which we think are going to support our client's claims in the end. Thank you very much. Thank you, Counselor. You reserve two minutes for rebuttal. We'll hear from everyone else. New York City Health and Hospitals. Good morning, your honors. My name is Emma Grunberg. I represent New York City Health and Hospitals and the appellees. The district court in this case properly dismissed the complaint for failure to state a claim. Gallagher Associates was an independent subcontractor engaged by Health and Hospitals on an at-will basis. The agency's exercise of its right to terminate their services after an inspector general's report substantiating findings of misconduct against Gallagher did not provide grounds for civil liability here. When do you think the for cause provision came in? How did that relate to the any time for no reason provision? Right. So there are two contracts at issue here. One is between Health and Hospitals and DynTech. The other is between DynTech and Gallagher Associates. And Health and Hospitals, in its contract, the only contract it's a party to, clearly retained the right to request replacement of subcontractor personnel at any time that it is deemed in the best interest of Health and Hospitals to do so. In the event that it exercises that right, the contract explicitly provides that DynTech shall immediately remove said subcontractor personnel. So that's a very broad discretion given to Health and Hospitals to direct the contractor, DynTech, to remove any subcontractor personnel at Health and Hospitals' discretion. It's your position that there's no for cause attachment to that provision? Well, it's clear there's no for cause attachment to that provision. The question of the for cause provision is in the other contract between DynTech and Gallagher Associates. And there you have two potential ways in which either DynTech or Gallagher Associates could terminate that contract. One says at any time and for no reason by written notice. The other is in case of a material breach of the contract between DynTech and Gallagher Associates. And that's a specific contract. It's in the record. It has specific terms. But the termination cannot be based on a discriminatory animus. Right. Do you agree? Absolutely. That's the law. Yes, absolutely. Even at will employees are protected against discriminatory animus. Absolutely. So this plaintiff complains that she was discriminated against on the basis of her gender. And gives some specific facts in her compendious complaint about how women were treated in this office. And isn't that a question for the jury? Your Honor, I think actually examining the allegations as they are reveals that certainly the standard is fact sufficient to plausibly give rise to an inference that the employer was motivated by discriminatory complaint in terminating Gallagher Associates. And here we have a lot of allegations about female and male consultants who were not associated with Gallagher Associates. For example, one of those consultants was Terry Coots. Who Gallagher Associates, again, was not associated with Gallagher. And the plaintiff alleges that she was treated badly and she was not liked by agency officials. But the complaint also alleges that she was hired and promoted to a full-time position as an employee over one of the defendant's strenuous objections. And that in fact, the both defendants who didn't like this female so-called outsider were in fact reassigned to another project on this female outsider's request. So yes, she does allege that certain agency officials did not like certain consultants. But to say that the agency had a pattern or practice, which I suppose is the allegation of treating women worse than men, that simply does not come out. There's all sorts of hirings and firings. It didn't come out in that case with Terry Coots. Right. But there are other instances of animus that was publicly exhibited. Like a saying, ding-dong, the witch is dead, when the other female was fired. Well, I'm glad you brought that up, Your Honor. That was the defendant, Melissa Weiss, who allegedly said that she, quote-unquote, celebrated this consultant's departure. She was fired by Health and Hospitals after Loretta Gallagher lodged a complaint against her for this very behavior. For that very? Yes. That was an allegation of the complaint. She was fired weeks after she celebrated the departure because- Short-lived. The celebration was short-lived. Exactly. And she was also fired months before Gallagher was terminated. So the idea that her inappropriate behavior could have given rise to an inference that the people actually in charge of retaining Gallagher or terminating Gallagher is simply not, it's not there on the face of this complaint. What about the notorious dinner? Right. Well, the dinner, the defendant who made that comment at the dinner, which clearly was inappropriate, was reassigned out of the Epic Project. And all of this universe is about the Epic Project. And all of this goes to support the fact that there was some discriminatory animus in the department. I don't think so, Your Honor, because that person was reassigned prior to Gallagher's termination at the request of Terry Coots. Does the complaint allege in any way that that person was involved in the decision to terminate Gallagher Associates? I don't think it can, Your Honor, because he wasn't in the chain of command. The complaint- It doesn't? No, it alleges repeatedly that he had animus against Gallagher Associates. I think it might allege that he had something to do with the complaint against them that led to the OIG report. But this defendant, Garofalo, made a vulgar comment about two female consultants, neither of whom had to do with Gallagher Associates. He was reassigned at the request of one of those female consultants. So, yes, he seems to be someone that does not work well with his female colleagues, but to say that that gives rise to an inference that Health and Hospitals, the agency, fired or terminated Gallagher Associates because of gender animus, that is not there on this complaint. Do you mind addressing the First Amendment claim? Yes, Your Honor. This is a question of law for the court, so it certainly can be decided on a motion to dismiss. The plaintiff has failed to plead the baseline requirement of such a claim, which is speech that is protected by the First Amendment. And as this court has made clear, the First Amendment doesn't constitutionalize an employee grievance just because that employee is employed by a public agency. The speech needs to be made as a citizen rather than as a consultant or an employee and on a matter of public concern. And here, the survey responses were explicitly requested by Health and Hospitals to members of the EPIC team. The cover letter said, if you're not working on the EPIC project, you can ignore this email. They were certainly given as consultants requesting feedback on the project, not as citizens. And then the email that Ms. Gallagher sent to her superiors is in the record, and I think it speaks for itself. She starts off by saying, here are the ways that I have been mistreated at Health and Hospitals. I've reached a fork in my EPIC journey. I'm not sure if I can go on. People are conspiring against me. And whatever merit or lack of merit those claims might have, this is not about her as a citizen being a whistleblower. This is about her saying, I don't like the way I'm treated, and I'm concerned about my future here. Why did you fire her? Well, because it's an at-will, we didn't give a written reason, but presumably it was because of the Inspector General report. So I want to be sure I understand this. Was she an at-will employee, or were you required to fire her for cause? She was not an employee at all. She was an independent subcontractor. So Health and Hospitals could direct Dentech to terminate her and replace her for any reason that it deemed to be in its best interest. Any reason or no reason? Any reason, right, exactly. In this case, I think the record shows that it was almost certainly the OIG report, which substantiated findings of misconduct, including that Gallagher had allowed her daughter to proctor epic exams taken by other of Gallagher's relatives, while signing a stipulation or a certification that she did not do so, and then lied about it during the investigation. And that's something that's in the report, which is in the record. And then also sent a number of confidential agency e-mails to her personal e-mail address, including employee evaluations, including employee test results, even after a memo was sent to all consultants and employees asking them not to do this specific behavior. So she was terminated after that, and the report actually made the explicit recommendation to terminate her. If the court has no further questions, we ask that the district court's opinion be affirmed. Thank you. Thank you. Counsel, you reserve two minutes. Thank you, Your Honors. Ding-dong, the witch is dead was Al Garofalo. It was not Ms. Weiss. What about the examination proctoring? Did she permit her daughter to proctor the exam? I'm glad Your Honor asked. At the time, there was an HHC shortage. It's alleged in the complaint there's a shortage. There's no one who's available to proctor the exam. So, yes, she actually, it was an open book, open everything exam. She proctored the exam as a volunteer, and under HHC's policies, an aunt and niece relationship is not a family relationship, and that's all alleged in the complaint, and that's the basis of the supposed- An aunt is not a family relationship? Under HHC's policies as demonstrated and specifically alleged in the complaint, that is not a family relationship. What about the email? It's not a tainted family relationship. That is, you can work with aunts. Right. Well, yeah, it's not a relationship that HHC ever cared about before. Sorry, Your Honor, I missed the question. The email issue. Yes. So the email issue, very specifically, first of all, the HHC website specifically invites emails to Dr. Raju, who is the head of HHC of complaints. The email specifically has issues that are of public concern, including issues about taxpayer waste of money. Did she use a personal email? The allegation was that she was sending work-related personnel documents to her personal email. Yes, as alleged in the complaint. She was specifically approved to work from home, and this was known by HHC and approved. Now suddenly it's a problem. Everything in the OIG complaint, and Al Garofalo is one of the people, we believe, we allege, who probably made this complaint. He was transferred. We heard from opposing counsel that he was transferred. Well, he was certainly transferred, but during the time that Gallagher was there, he was setting up determination. The OIG complaint was there to create cause determinator. Every single statement in that OIG complaint we allege, and we go chapter and verse, is false. And, in fact, if the OIG complaint was on day, let's call it April 1st, okay, everything that is said to be a problem that was being investigated should only be up to April 1st. The OIG complaint talks about this exodus of employees. That didn't happen until after the OIG complaint was filed. The fix was in here. They wanted to create cause, and the fact that they wanted to create cause, by the way, goes to the issue of how the relationship was gone about between the parties to show that they believed they had to have cause to terminate Gallagher, which is specifically alleged. They didn't want this female working there? She was too competent, and she was embarrassing them. She was a too competent female, so they wanted her fired. Yes, because they were highly, as alleged in the complaint, they had no idea what they were doing. Don't you think that has plausibility problems? No, Your Honor, I don't think so at all, because it's in their own HHC, as is alleged, was the first company, and it's actually in Loretta Gallagher's 217 email, that decided they weren't going to do the best practices of EPIC, which would have saved about 10% on the cost. This is a $1.4 billion project. It would have saved the taxpayers millions and millions of dollars, and they were too incompetent to do it. Loretta Gallagher, all throughout, was doing her job in a manner to comply and comport with EPIC requirements. She's an expert at it. She's a pioneering businesswoman who knew and understood this procedure well, where no one else did. I knew more than all the EPIC people. It's your theory. No, the EPIC people were not involved here. This is HHC, who are not EPIC people. I knew more about the EPIC project than anybody else. The HHC employees had no EPIC experience. Loretta Gallagher was highly experienced. That's what she was hired for. That's exactly what she was hired for. And she was very experienced, very qualified, a pioneering woman. She really, this was at the cutting edge, and they knew exactly what her qualifications were when they brought her in. And they resented her, and they were embarrassed by her because they could not get things done in a timely and efficient manner. And then they retaliated against her way after way. Why didn't it work? Why wouldn't the fact that she was so competent reflect well on the people that hired her instead of badly? It wouldn't reflect well, and it didn't reflect well because there was a large, she was only one part of this whole project. There were a lot of moving parts here. Only her part was being done timely, and all the reports that are in the record show that she was on time, doing things the way she was supposed to do, reporting properly. They actually changed her reports to reflect that she wasn't doing so well. That's absolutely provable. It's in the record. They changed her reports without her permission to make themselves look better and her look worse. So what's your theory, that they went after her because she was too competent, or they went after her because she was a female? She, Terry Coots. Which of the two is it? It's actually, it's both, really. All the female outsiders who were brought in were mistreated and discriminated against. They were all competent, and ultimately, with respect to Terry Coots, she was given threatening letters, we allege, by Al Garofalo. She reported it. Garofalo was never investigated, and she was so worried and scared, as we allege, that she resigned. But then she got a better job. No, no, this is, no. After she went from consultant to full-time, they still were harassing her with letters, anonymous letters. She got three anonymous letters, and they're threatening to destroy her. And she just said, I'm done. She wasn't going to do it. She reported it, and HHC did nothing. Garofalo was still employed by HHC, even after that meeting, and in that dinner. And at that dinner, he specifically referenced Loretta Gallagher by saying to James Gomez, who gave the affidavit, I used to hate you because you were friends with Loretta Gallagher. That's incredible animus. And he was her supervisor, and we allege that he was responsible, one of the people responsible, for creating this phony OIG complaint, which led to a phony cause termination, because that entire OIG report contains falsehoods from top to bottom, as is specifically alleged in the second amended complaint and the amended complaint. Thank you very much. Thank you very much, too. We appreciate the argument.